[No. 1744.]

ISRAEL LOVELADY *v.* THE STATE.

MURDER — CORPUS DELICTI — EVIDENCE.— See 14 Texas Ct. App., 545, for evidence adduced on a former trial of this case, and the opinion *in extenso* for additional evidence adduced upon this trial, *held* insufficient to support a conviction for murder in the first degree, because, in failing to establish that the death was the result of a criminal agency, it failed to establish the *corpus delicti*. Note the medical authorities quoted in the opinion of this court.

APPEAL from the District Court of Wood. Tried below before the Hon. F. J. McCord.

This appeal is from the appellant's second conviction in the first degree for the murder of his wife, Anna Lovelady, in Wood county, Texas, on the 30th day of January, 1882. On each conviction a life term in the penitentiary was assessed against him as punishment. On page 545 of the 14th volume of these Reports will be found summarized the whole of the testimony adduced upon the first trial, and which was repeated with little variation on this last trial. A sufficiently full synopsis of the additional testimony produced upon this trial is set out in the opinion of the court.

The insufficiency of the evidence was one of the grounds relied upon for new trial.

*Herndon & Cain*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. A second time has appellant been convicted in this case of murder in the first degree, with a life term in the penitentiary assessed against him as punishment. On the former appeal, reported in the 14th Court of Appeals Reports, 545, it will be found that the main question presented was the sufficiency of the evidence to support the verdict and judgment, and that after a most able review and discussion of the facts by Judge Willson, delivering the opinion of the court, it was said, "Believing that the evidence in this case is insufficient to establish the *corpus delicti*, in that it fails to satisfactorily prove that the death of the deceased was caused by the criminal act of another, it becomes unnecessary for us to consider the case further; and the judgment is reversed and the cause is remanded for another trial."

At the very threshold of our investigations into the merits of this second trial as developed by the record before us, we are again confronted with this most important — most vital — question: Does the evidence disclosed establish the *corpus delicti?* If it does not, then it would perhaps be a useless as well as unnecessary consumption of both time and labor to discuss the other questions raised; for, however interesting such a discussion might prove, the questions as presented are none of them likely to arise upon another trial.

On the first trial ten witnesses were used by the State; on the second the prosecution used nine. Of those ten witnesses used by the State at the former trial, one (Browning) was dead, and three,

that is James Grant, Dr. Skeen and W. L. Stevenson, were not called to testify for the prosecution. But five new witnesses in addition to the old ones were used by the State, to wit, Mrs. Peevy, W. A. Jenkins, John L. Castle, M. D. Carlock and Dr. Fowler. Appellant used four witnesses upon the first trial, and the same and two additional ones upon the second, to wit, Jesse Robinson and Dr. Skeen, who had been formerly a witness for the State. So far as the witnesses on the first trial are concerned, there is little, if any, appreciable difference in their testimony, except perhaps in the instance of Mrs. Etha Browning, who now deposes to a fact not testified to on the first trial and says: " I saw deceased when she was dead. She was lying on some plank. I saw blood on the floor next morning, and near the fire-place and near the bed close to where she was lying; the biggest part of the blood was at the fire-place." No other witness mentions blood near the bed.

Of the new testimony by the new witnesses, Mrs. Dr. Peevy speaks of a transaction which occurred, and a conversation which took place, some time before the death of deceased, between herself, deceased and her husband, the defendant, in which defendant said that the deceased "should never have an heir by him," and that, in reply to the question asked him by witness, what he would do with the children if his wife had them, he said, "we'll kill them out, won't we, Mrs. Peevy?"

The witness Jenkins saw blood about the head of deceased, and saw signs of where water had apparently been poured down upon the floor and then swept off with a broom towards the fire-place. The witness Castle says: "I looked at her and saw a bruise on her cheek, and a place one way and another three inches across, making a perfect cross, and a cross on top of her head and about two and a half inches. I run my hand under her head, when I noticed blood dripping on the floor, and felt to see if I could see what was causing the blood. I felt all under the back of her head, and there was a jelly place apparently as big as my hand. . . . Her flesh was not the color of a burn. . . The bruise on her cheek looked dark like a bruise. This bruise was of a dark brown around it, and looked like the blood had settled in it. The cross on the top of her head looked like it was cut. I could see her skull at the cross wound. . . The place where it was cut on her cheek was blue and black to the bone."

The witness Carlock was the coroner who held the inquest. His testimony is mainly devoted to a description of the fire-place, hearth, mantel piece, and adjacent floor.

Dr. Fowler was called as a medical expert. He had heard the testimony of all the preceding witnesses. After qualifying himself as an expert he said: "I have made a study of the effect of fire burns on the human system, to some extent. I can tell whether the body was dead when burned or burned to death. I think an ordinary fool can tell that. From the description given by the witnesses who have already been sworn in this case and testified, I would infer the cut was done by some sharp instrument. The bruise on the cheek and also the bruise on the back of the head must have been done by a blow or a fall, or something. I have no opinion as to the cause of the woman's death. I did not see the body. Take the blow on the face, I would not say what effect it would produce. Take the one on the back of the head as described by the witnesses, I think it would produce death immediately. The appearance of flesh before death where burned is blister and red around it, and after death puffy and full of air. Her condition as shown did not indicate death from fire." (Cross-examined.) "I can't tell whether the cut on the top of the head was done by an act of violence from the hands of another or not; nor can I tell whether the bruises were inflicted by the hands of another or not. The blood does not coagulate at a burn. It stops, and is black. I cannot say what produced the woman's death. If the body had been burned to death before the wound on the back of the head was received, it would not have bled. She must have died from wounds and not fire."

At this point Dr. Fowler's examination was suspended, and the witness Gorman was recalled and he stated: "The back of the neck was burned and the skin all slipped off. It was burned away down her neck very badly. The blood was settled like jelly all down the back of the neck. The skin was all slipped off on the breast; the nipples were burnt off." Dr. Fowler resumed: "A body burnt and dying from the wounds will have blood settled at the wound or burn. A person pitching in the fire and dying suddenly would be different from one lingering. I am not prepared to tell the exact difference. I can't say how the woman came to her death. I would not positively say how it was." In rebuttal he said: "If she died from the burns alone there would be no blood. I can't give my opinion as to how she got the wounds, because I have no knowledge of them except what I have heard from the witnesses while on the stand. I don't think it possible for the woman to have got all the wounds at one fall. I don't see how it was possible for the deceased to receive the wound on top of the head by a fall in the fire-place."

We have thus given all the material testimony in substance of the new witnesses who testified upon this second trial. That of the old witnesses was about the same as they gave on the former trial, except that in the present case no one testified that there were any old ploughshares in the fire-place.

Does this new evidence establish the *corpus delicti*, when considered with and as additional to the evidence formerly adduced on the first trial?

Evidently the most important portion of this testimony is that of the medical expert, Dr. Fowler. He says "her condition as shown did not indicate death by fire." " She must have died from wounds and not fire." " I don't think it possible for the woman to have got all the wounds at one fall. I don't see how it was possible for the deceased to receive the wound on top of the head by a fall in the fire-place." It is shown that there were " broken andirons in the fire-place, one of which was turned up;" "the back and jams were of brick and rock and fallen in; there were pieces of brick and rock in the fire-place."

Wharton and Stille, in their standard work upon Medical Juris-prudence, treat extensively of the subject of wounds and burns. In connection with Dr. Fowler's testimony, we propose to make a few extracts from this valuable work. They say, speaking of incised and punctured wounds: "the shape of the wounds differs some-what according to the region of the body and the tissues divided, as well as the state of tension or relaxation of the skin, and the direc-tion in which the blow is given." (Whart. & Stille, Med. Jur., § 808.) With regard to lacerated and contused wounds they say: " These being frequently due to accident, and seldom presenting any peculiarity by which the use of a weapon can be positively inferred, an opinion can rarely be given merely from an inspection of the wound of the cause by which the injury was produced. A medical witness may indeed be enabled to state the possibility of the wound having been made by a blunt instrument similar to that which is perhaps shown at the inquest or trial, or found near the de-ceased, but can seldom, on the other hand, deny that it may have been of accidental origin or caused by a fall. The aspect of wounds of this class is of course too characteristic to require description. When, however, they are situated upon the skull they often bear the aspect of incised wounds, the edges being apparently cleanly cut and capable of being adjusted together. The division of the integu-ments is not, however, straight and regular as in an incised wound, and the angles of the wound are generally less acute. . . . But

practically the chief difficulty in judging of the origin of lacerated and contused wounds is that injuries of this kind may be received by a fall in a quarrel or in the retreat of one of the parties, similar in appearance to those which might have been produced by a direct blow." (*Id.,* § 809.)

These same authors, in chapter VII, treat of burns and scalds. They say: Orfila says that *vesications* (blisters on the skin) manifestly denote that the burn was made during life. According to Dervegie, if boiling water or a red hot iron be applied to the skin of a person ten minutes after death, neither *redness* nor vesications will be produced, and that it is not possible to mistake a burn made after death for one which was made before it. Dr. Christiburn made six experiments with a view of satisfying himself as to the distinction. He says that it is evident from these that the application of heat, even a few minutes after death, causes no effects which can be mistaken for those endured by vital reaction." . . . "It may, therefore, we think, be fairly inferred that with perhaps the exception of anasarcous bodies the presence of vesications upon the skin may be looked upon as a sure indication of the burns having been made during life or immediately after, while the body is still possessed of a certain degree of organic vitality. Their absence, however, will be no evidence that the burns were not made upon the living person, since it is very possible that only the more serious results of burning may be found." (*Id.,* § 867.)

With regard to wounds upon the burned the same learned authors say: "There are certain mechanical effects produced by fire upon the skin, which should not be mistaken for wounds. Thus in a case given by Caspar of an old man whose clothes caught fire as he was seated before his stove, the body was burned black and on the right side, over the liver, was a gaping wound through which the viscera could be seen. It was nothing more than a fissure caused by intense heat." (*Id.,* § 870.)

From these authorities, it will be noticed that contused wounds upon the skull often bear the aspect of incised wounds, the edges being apparently cleanly cut. The cross wound or cut upon the head of the deceased appears to have satisfied the medical experts in this case that it could not have been done by a fall in the fire-place. If it could not have been done by the andirons, there were bricks and rocks which would and could have produced a contused wound which, according to the authorities, might have presented a clean cut appearance, and especially so when after such contused wound was inflicted, the scalp was subjected to such heat as shown in this

case,— a heat which was likely to produce the appearance of a gaping wound. Nor do we think it unreasonable or improbable that all the wounds described might not have been produced by the fall, and the struggles in the fire-place after the fall. We have shown how the one on top of the head might have been accounted for, and we think the struggles of the party, even if she had swooned and been insensible — struggles caused by the organic vitality being subjected to the intense heat of the living coals of fire — might have produced the appearances of the other two wounds as described, to wit, the one on the back of the neck and the bruise on the face. But in this we may be mistaken.

We are of opinion, however, that but little, if any, additional strength has been given to the case as made in this prosecution for the State, to that as made in the former trial, and, as was then said, so we feel constrained to say again,— "believing that the evidence in this case is insufficient to establish the *corpus delicti*, in that it fails to satisfactorily prove that the death of the deceased was caused by the criminal act of another, it becomes unnecessary for us to consider the case further, and the judgment is reversed and the cause remanded for another trial."

*Reversed and remanded.*

[Opinion delivered December 6, 1884.]